Helene Irwin Fagan v. Commissioner.
Fagan v. Commissioner
Docket Nos. 13361, 18320.
United States Tax Court
1950 Tax Ct. Memo LEXIS 290; 9 T.C.M. (CCH) 44; T.C.M. (RIA) 50017; January 26, 1950
*290 The petitioner completed building a residence in 1929. In 1933 she decided never again to use the property as a residence. The property was listed with a real estate broker from 1933 to 1941 as being for sale and from 1941 to 1947 for sale or rent. The property was sold in 1947. Held, under the provisions of section 23 (a) (2) and section 23 (1) (2), the property was held for the production of income when it was offered for sale in 1933. The fair market value of the depreciable portion of the property is determined as of that date. In 1929 the petitioner purchased ten non-interest bearing notes of Monterey Hospital, Ltd., at face value of $1,000 each. The petitioner considered that the purchase of these notes was a proper gesture of interest in support of a community hospital then in the process of being built. The notes were sold in 1943 for a total consideration of $100. Held, this was not a transaction entered into for profit within the meaning of section 23 (e) (2), I.R.C.
Theodore R. Meyer, Esq., and Robert H. Walker, Esq., 111 Sutter St., San Francisco, Calif., for the petitioner. C. W. Nyquist, Esq., for the respondent. VAN FOSSAN Memorandum Findings of Fact and Opinion The respondent determined deficiencies in the petitioner's tax liabilities as follows: Docket
No.
Year
Tax
Amount
13361
1943
Income and Victory
Tax
$19,942.48
18320
1944
Income Tax
8,866.98
The year 1942 is involved in these proceedings due to the forgiveness provisions of the Current Tax Payment Act of 1943. Certain issues were not contested by the petitioner *292 or were settled by stipulation, leaving in controversy the following: 1. The fair market value of the depreciable portion of a residence at the time of its conversion to property held for the production of income, 2. Whether or not the loss realized on the sale of certain non-interest bearing notes was a loss incurred in a transaction entered into for profit within the meaning of section 23 (e) (2) of the Internal Revenue Code. The case was submitted upon a stipulation of facts, exhibits, oral testimony and a deposition. The facts stipulated are so found. Other facts are found from the evidence. Findings of Fact The petitioner, Helene Irwin Fagan, is an individual and is now, and has been since 1925, a resident of the town of Hillsborough, County of San Mateo, State of California. The property, the value of which is here in issue, is referred to hereinafter as the Pebble Beach house, or the house, and includes the adjacent garage. The petitioner commenced construction of the Pebble Beach house in 1926, with the intention of occupying it as a residence for a part of each year. Construction of the house was completed in December, 1929, at a total cost *293 to the petitioner of $700,911.97, exclusive of the cost of the land. The land upon which the house was located was 2.924 acres in area and was acquired by the petitioner in 1923 at a cost of $20,000. An adjoining parcel of 1.610 acres was purchased by petitioner in 1931 at a cost of $10,000, and is still owned by the petitioner. After the petitioner married Paul I. Fagan in 1929, her plans for the use of the Pebble Beach house changed. The petitioner and her husband decided to divide their time between Hillsborough and the Hawaiian Islands and abandoned her plans for using the Pebble Beach house as a part time residence. Petitioner built a new house in Hawaii in 1930 which cost her approximately $350,000. Neither the petitioner nor her husband ever occupied the Pebble Beach house as a residence, and, in fact, never used it at all except for a few weekends (from four to ten in number) in 1930 and 1931, and on one occasion in 1931 when the petitioner's husband spent about ten days in the house recuperating from a broken back. In 1933 the petitioner decided to sell the Pebble Beach house. This was in accordance with her decision at that time never to use the house again. The petitioner *294 listed the house for sale with a licensed real estate brokerage firm in 1933. This firm was told to submit to petitioner any reasonable offers. There were no offers made until the house was sold in 1947. The petitioner's original minimum price in 1933 was $250,000. By 1941 this price was reduced to $200,000. The house was continually listed for sale from 1933 to 1947. During this period the house was shown to numerous prospects by the real estate dealer with whom it was listed. One saleswoman showed it to approximately 100 prospects. Other real estate agents and firms who knew that the property was for sale and the petitioner's financial agents also attempted to sell it. The Pebble Beach house and the 2.924 acres of land upon which it was located was sold in 1947 for the sum of $160,000. This was an arms length transaction at the then market value. In 1941 the petitioner listed the house for rent at a rental of $1,000 per month for the summer months, or $750 per month for a three to six months' lease, or $500 per month for a lease for a year or longer. The Pebble Beach house continued to be so listed for rental from 1941 to 1947 when the house was sold. During those years, the *295 petitioner and her husband and various real estate agents made continual efforts to rent the house. The petitioner never succeeded in renting the house except for a period of three days in 1946 when it was rented in connection with the filming of a motion picture. The expenses of maintaining the Pebble Beach house paid by the petitioner and all of which were ordinary and necessary were $3,809.01, $4,083.27 and $4,189.52 in the years 1942, 1943, and 1944, respectively. The following table shows the assessed value of the Pebble Beach house (excluding the land upon which it was located), determined by the County Assessor of Monterey County, State of California, for real property tax purposes for each of the years 1929 to 1944, and the percentages of actual value stated by said Assessor to be represented by assessed values generally in the County: Assessed
Per-
Year
Value
centage
1929
$175,000
33 1/3
1930
175,000
33 1/3
1931
175,000
40
1932
100,000
40
1933
70,000
40
1934
70,000
40
1935
91,000
50
1936
91,000
50
1937
100,000
50
1938
100,000
50
1939
90,000
50
1940
90,000
50
1941
90,000
50
1942
90,000
50
1943
60,000
50
1944
54,000
50
*296 The Pebble Beach house was conceived of by the petitioner as a perfect example of Byzantieg style of architecture. The petitioner took an active interest in the building of the house. She consulted the architect and visited the site of the house on numerous occasions during the period of construction. She furnished the house largely with antiques brought from Europe. The house itself is located on Monterey Peninsula approximately 120 miles south of San Francisco on the coast of California. The area is famous for its even climate and scenic beauty. The Pebble Beach house is situated in the most desirable section of the peninsula overlooking Carmel Bay and the ocean in an area of large homes and estates. The house was built into the side of the hill amidst the trees and rocks. The house is 180 feet long and varying in width from 24 to 44 feet. It contains two floors above the ground and a basement. The first floor consists of an entrance hall, drawing room, dining room, and various service rooms and servants' dining and bedrooms. The second floor contains seven bedrooms and bathrooms. The house is of reinforced concrete and stone. The exterior walls are of French limestone. Many *297 of the interior walls are finished with this same French limestone. The floors of the principal rooms are of marble, mosaic or travertine with oak flooring in the servants' sections. The roof is wood construction overlaid with handmade terra cotta tiles. The cloister columns and the interior and exterior columns of the entrance hall are of imported Italian marble with carved marble caps. The windows of the main room are of metal with wide lead reinforcements. The main door is of hardwood with bronze outer covering. The heating system is partly direct and partly indirect. Most of the radiators are concealed behind carved stone grilles. The plumbing consists of brass piping and the bathroom fitting are of antique design. The floor in one of the bathrooms is inlaid with marble and gold leaf and covered with glass and the fixtures are of gold finish. The black marble tub is carved to resemble a sarcophagus. The garage is construted of the same material as the house. The first floor has a capacity for four automobiles. The second floor contains additional servants' living quarters. The house was appraised by a firm of appraisers in 1933 as having a cost of replacement at that time of *298 $300,997.45 and a sound value of $270,897.71 based on depreciation of 10 per cent. The size and character of the house decreased the number of potential buyers. The house was of such size that it required about 12 servants to staff it properly. The parties have stipulated that the rate of depreciation for each of the taxable years shall be two per cent per annum of the basis for depreciation as shall be determined by this Court. We find that the fair market value and the basis for depreciation of the house, including the garage but excluding the land on which it is situated, was $150,000 in 1933. In 1929 the petitioner purchased at a total cost of $10,000 ten non-interest bearing debenture notes of Monterey Hospital, Ltd., having a face value of $1,000 each. The petitioner sold all of the notes in 1943 for a total consideration of $100 to a doctor on the staff of the hospital. The petitioner purchased these notes in what she considered to be a proper gesture of interest in support of a community hospital then in the process of being built. The purchase of these notes by the petitioner was not intended to result in a profit to her. In the petitioner's tax returns filed for *299 1942, 1943, and 1944, the respondent disallowed deductions for depreciation and maintenance expenses of the Pebble Beach house for lack of evidence that the property was held for the production of income. In the petitioner's tax return filed for the year 1943 the respondent disallowed a deduction for a long-term capital loss of $4,950 (50% of $9,900) on the sale of the noninterest bearing notes of Monterey Hospital, Ltd. Opinion VAN FOSSAN, Judge: The first issue to be decided is the fair market value of the depreciable portion of a residence property at the time of its conversion to property held for the production of income. The pertinent sections of the Internal Revenue Code are as follows: "SEC. 23. DEDUCTIONS FROM GROSS INCOME. "In computing net income there shall be allowed as deductions: (a) Expenses. - * * *
"(2) Non-Trade or Non-Business Expenses. - In the case of an individual, all the ordinary and necessary expenses paid or incurred during the taxable year for the production or collection of income, or for the management, conservation, or maintenance of property held for the production of income. * * *
"(1) Depreciation. - A reasonable allowance *300 for the exhaustion, wear and tear (including a reasonable allowance for obsolescence) - * * *
"(2) of property held for the production of income. * * *
The respondent in his letters of deficiency disallowed entirely deductions for depreciation and maintenance expenses of the Pebble Beach house in 1942, 1943, and 1944. In his brief the respondent abandoned this position and conceded that during the taxable years the house was held by the petitioner for the production of income in so far as deductions under section 23 (a) (2) and 23 (1) (2) are concerned and that at some time prior to the taxable years the property was converted to property held for the production of income. The property has been adequately described and its fair market value of $150,000 in 1933 determined in our findings of fact. The question of when the property was converted to property held for the production of income requires further consideration. The specific question is whether the property was held for the production of income in 1933 when it was first offered for sale or whether it was so held when it was offered for sale or rent in 1931. In Mary Laughlin Robinson, 2 T.C. 305, *301 we held that the abandonment of property as a residence and the listing of it for rent or for sale with real estate firms was an appropriation of it to income producing purposes. In our opinion, a proper interpretation of the term "property held for the production of income" would lead to the conclusion that this property was so held in 1933 when it was permanently abandoned as a residence and offered for sale. Such would seem to be within our holding in the Robinson case. We so find. This view is supported by the respondent's Regulations 111, section 29.23 (a)-15, wherein he states, in part, as follows: "* * * Expenses incurred in managing, conserving, or maintaining property held for investment may be deductible under this provision even though the property is not currently productive and there is no likelihood that the property will be sold at a profit or will otherwise be productive of income and even though the property is held merely to minimize a loss with respect thereto." Our findings of fact that the fair market value of the house in 1933 was $150,000 is well supported by the evidence. The parties made greatly divergent claims as to its fair market value. The petitioner *302 introduced testimony of a real estate appraiser and two real estate sales people, all of whom had experience with property in that area and who testified that the house was worth from $300,000 to $350,000 in 1933. The respondent's one witness, a real estate appraiser, testified that the house had a fair market value of $35,000 in 1933. The respondent's witness had considerable experience in appraising real estate property but had not previously appraised nor participated in the sale of any property in the Pebble Beach area. These estimates offered by the parties are of the value of the house and garage and excluded the value of the land. The property was listed for sale with a real estate broker from 1933 until 1947. The property was shown to about 100 people by one saleswoman alone. The price asked in 1933 was $250,000. This price was reduced to $200,000 by 1941. There were no offers made for the purchase of the house which were reasonably close to these amounts. In point of fact, the record discloses no offer made prior to the consummation of the sale of the property in 1947 for $160,000, which figure included land and building. In arriving at the fair market value of the house *303 in 1933 we have considered, among other factors, its location and design, the original cost, the replacement cost, its appraised value for local taxes, the condition of the real estate market at the various times, the several opinions of real estate experts and the limited number of potential buyers of such a property. The petitioner should be allowed deductions in the taxable years for expenses of maintenance and for depreciation at the stipulated rate of two per cent per annum of the basis herein determined. The second issue is whether or not a loss realized on the sale of certain notes was deductible under the provisions of section 23 (e) (2) of the Internal Revenue Code: "SEC. 23. DEDUCTIONS FROM GROSS INCOME. In computing net income there shall be allowed as deductions: * * *
(e) Losses by Individuals. - In the case of an individual, losses sustained during the taxable year and not compensated for by insurance or otherwise - * * *
"(2) if incurred in any transaction entered into for profit, though not connected with the trade or business; or" * * *
The notes were non-interest bearing, purchased at a total face value of $10,000. *304 The petitioner considered that their purchase in 1929 was a proper gesture of interest in support of a community hospital then in the process of being built. The notes were sold in 1943 for a total amount of $100. These facts lead us to conclude that this was not a transaction entered into for profit and that the loss on the sale of the notes is not deductible within the meaning of the applicable provisions of the Code. Decision will be entered under Rule 50.